UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA,                )<br>                                                                )<br>        Plaintiff,                                          )<br>                                                                )    No. 6:13-CR-40-ART-HAI-5<br>v.                                                            )<br>                                                                )    RECOMMENDED DISPOSITION<br>PATRICIA ANN SOLOMON,                 )<br>                                                                )<br>                                                                )<br>        Defendant.                                      )<br>                                                                ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Pursuant to a search warrant, law enforcement searched the Wellness and Pain Center of Broward ("PCB") on June 3, 2014. During that search, Defendant Patricia Ann Solomon made potentially incriminating statements to law enforcement concerning her role in the distribution of oxycodone and alprazolam at PCB. Later indicted for two controlled substances offenses, Solomon, through counsel, now moves to suppress those statements on the basis that she was initially in custody but not advised of her *Miranda* rights prior to being interrogated, that the statements were coerced and therefore not voluntary, and that she was only advised of her *Miranda* rights midway through her interrogation in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). Because, after a thorough review of the record and applicable case law, the Court finds that Solomon was not in custody and her statements were not coerced, the Court **RECOMMENDS** that her motion to suppress be **DENIED**.

I. PROCEDURAL POSTURE

On November 5, 2014, the grand jury returned a superseding indictment against Solomon and six others for, in relevant part, conspiracy to dispense and distribute a quantity of pills containing oxycodone and a quantity of pills containing alprazolam in violation of 21 U.S.C. §§

841(a)(1) and 846. D.E. 121. Arraigned on January 23, 2015, Solomon pled not guilty and a scheduling conference is currently set for August 7, 2015, to schedule a trial in this matter. D.E. 179; 384.

On April 30, 2015, Solomon, through counsel, filed a Motion to Suppress and Request for Evidentiary Hearing and a supporting memorandum claiming that the use of her statements would violate her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), that her statements to law enforcement were not voluntary, and that her statements are inadmissible under *Missouri v. Seibert*, 542 U.S. 600 (2004). D.E. 246; D.E. 246-1. The Court conducted an evidentiary hearing on May 21, 2015. D.E. 256. At the hearing, the parties were given a full opportunity to present any evidence concerning the motion. D.E. 273. The evidence presented narrows the inquiry to two primary issues: (1) whether Solomon was in custody at the time she made certain statements to law enforcement, and (2) whether Solomon's statements were coerced. As allowed by the Court, Solomon submitted a post-hearing brief (D.E. 344), but the United States did not file any timely response brief; thus the matter is ripe for decision.

## II.   DISCUSSION

### a.   Proposed Findings of Fact[1]

The Court is required to analyze the totality of the circumstances based upon the evidence presented. Much of that evidence establishes undisputed facts. However, Solomon's testimony conflicts, in part, with that of the government's witness, Task Force Officer Richard Dalrymple. Such conflicting testimony requires that the Court assess the credibility of these witnesses.[2]

---

[1]   *See* 28 U.S.C. § 636(b)(1)(B)-(C).
[2]   Solomon and Dalrymple contradicted each other as to whether co-defendant George Pierce Jones, III, was handcuffed on the day of the search (compare D.E. 312 at 20, 78 (Dalrymple testifying that Dr. Jones was not arrested or put in handcuffs) with *id*. at 44, 73, 75-76 (Solomon testifying that Dr. Jones was handcuffed and held in the patient waiting room with

2

The evidence conflicts as to whether Solomon was told that she could not leave during the search of PCB on June 3, 2014. Dalrymple testified that he did not tell Solomon she was not free to leave PCB, and did not observe anyone else do so. D.E. 312 at 12, 22. Solomon testified that DEA agents (but not Dalyrmple) "told [her] to stay there." *Id*. at 45. She testified that Agent Than Churchin told her that she could not leave and that she had to stay in the front office (*Id*. at 58-59), and she answered in the affirmative when asked if "that was because they were searching in the back of the business." *Id*. at 59. However, Solomon also testified that she was never told she could not leave (*Id*. at 57-58) and that "no one asked me to stay. I had to stay. I felt like I had to stay." *Id*. at 58. When asked on redirect examination what Churchin told her, Solomon answered, "I had to sit there to be interviewed." *Id*. at 73.

The evidence also conflicts as to whether Solomon was told that she was not under arrest on June 3, 2014. Dalrymple testified that he told the employees of PCB "that none of them were under arrest and we were there to search the clinic." *Id*. at 14, 22, 29. Solomon testified, "No one said that we were not under arrest. They said we're being – going to be held to be questioned." *Id*. at 57. However, she testified on cross-examination that, during her interview, Special Agent Williams told her that she was not under arrest. *Id*. at 64.

Finally, the witnesses differ as to whether law enforcement threatened Solomon on June 3, 2014. Dalrymple testified that he never told Solomon that she would be taken to jail if she did not answer questions, and never threatened Solomon in any way. *Id*. at 16-17. Solomon testified that he "told me that I needed to get a good lawyer . . . and don't leave town, and he did call me a drug dealer." *Id*. at 51. She further testified that Dalrymple told her "'[PCB owner Joel Shumrak is] in a lot of trouble. You're going to go down with him.' He says, 'We know

---

Joel Shumrak for four to five hours)). However, whether Dr. Jones was handcuffed is not essential to the determinations made herein.

3

everything that went on in this clinic.' And he says, 'You better say something bad about Joel or you're going to go in the jail cell right next to him.'" *Id*. at 52. Dalrymple testified that no agent raised his or her voice at Solomon or made physically threatening gestures. *Id*. at 32. Solomon testified that Investigator James Browning "raised his voice to me and he told me that I better cooperate." *Id*. at 49.

The Court recognizes that the importance of Solomon's constitutional rights requires careful scrutiny of Dalrymple's testimony, and that law enforcement personnel are not always truthful. The Court has carefully evaluated all the evidence presented and the credibility of each testifying witness in light of the legal standards applicable to Solomon's motion. Based upon that careful evaluation, the Court does not credit Solomon's version of the disputed events. As suggested by the Sixth Circuit, the Court details its reasoning as to this credibility determination. *See United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990).

First, Solomon did not testify consistently with regard to whether she was told she could not leave, or whether she was told that she was not under arrest. During the evidentiary hearing, Solomon initially testified that she was told to stay there, and that she could not leave. D.E. 312 at 58-59. However, she also admitted that she was never told that she could not leave and that no one asked her to stay. *Id*. at 57-58. Similarly, Solomon initially testified that she was never told that she was not under arrest. *Id*. at 57. She later unequivocally stated that Special Agent Williams told her that she was not under arrest. *Id*. at 64.

Second, Solomon's testimony is undoubtedly biased in seeking suppression, which bias is certainly relevant to her credibility. "[C]onsideration of what a witness has to gain or lose from [his] testimony is an accepted part of the credibility determination." *United States v. Lockhart*, Criminal Nos. 12-09-ART-(4), 12-08-ART-(2), 12-08-ART-(4), 2013 WL 1412338, *4 (E.D.

4

Ky. Apr. 4, 2013) (citing Sixth Circuit Pattern Jury Instruction 1.07 that directs jurors to consider whether the witness has "anything to gain or lose from the case"). Dalrymple has no such personal bias, and none is suggested by the record. On the contrary, Dalrymple's career in law enforcement would be jeopardized by lying under oath, suggesting a strong incentive to adhere to the truth.

Finally, Dalrymple's testimony signifies candor. He acknowledged telling Solomon he believed her to be a "drug dealer." D.E. 312 at 17-18. As a licensed physician's assistant, this was no doubt derogatory to Solomon. Admitting to use of this description, which some may view as insulting and unprofessional, bolsters Dalrymple's credibility. Additionally, Dalrymple testified that he *Mirandized* Solomon in response to her making what he believed to be a false statement. While some may cynically view *Miranda* warnings as threatening, Dalrymple's testimony reflects respect for Solomon's rights. The Court finds that these portions of Dalrymple's testimony indicate truthfulness on his part.

Thus, the Court rejects Solomon's testimony concerning the disputed events.[3] Based on the testimony of Dalrymple and the credible testimony of Solomon, the Court makes the following proposed findings of fact. On June 3, 2013, a group of DEA agents executed a search warrant at PCB shortly after 8:00 a.m.[4] D.E. 312 at 40. The search was initiated by a group of about six law enforcement officers. *Id*. at 19. Upon entry, all law enforcement officers were wearing clothing identifying themselves as such, and the initial group entered with weapons drawn. *Id*. at 17. After securing the building, all weapons were holstered (*Id*. at 17), and the rest of the search team (who had been waiting outside) entered PCB (*Id*. at 19). PCB Owner Joel

---

[3] The Court does not base its credibility determination on the issue addressed in Solomon's post-hearing brief filed at Docket Entry 344.

[4] Officer Dalrymple did not recall when the search began, but testified that it began shortly after PCB opened. D.E. 312 at 7, 18. Solomon testified that the search began "at ten minutes after eight approximately." *Id*. at 40.

5

Shumrak was arrested and handcuffed that morning. *Id*. at 7. Officer Dalrymple entered PCB soon after the initial group of DEA agents. *Id*. at 7. The clinic employees and patients present at the clinic that morning were taken to the business office located in a front room of the clinic. *Id*. at 13, 41. They were told that they would require an escort to use the restroom, which was in the back of the clinic. *Id*. at 13-14. Dalrymple testified that this was because law enforcement would not let them move freely about the area being searched. *Id*. at 14, 23. The front door of PCB was open during most of the search. *Id*. at 23. Dalrymple testified that, when he first walked in, he told everybody in the business office, including Solomon, "that none of them were under arrest and we were there to search the clinic and that we had a search warrant for it and that we would like to talk to each one of them individually." *Id*. at 14. Nobody was told that they could not leave the business office. *Id*. at 23. The search took several hours to complete. *Id*. at 24.

Law enforcement began interviewing the employees and patients in exam rooms once each room had been searched and cleared. *Id*. at 24. These persons were each taken to separate rooms to be interviewed individually as "a matter of practice" to protect the integrity of the interviews. *Id*. at 24-25. Solomon waited in the business office until she was asked to be interviewed around 1:00 p.m. *Id*. at 43. Solomon was interviewed in a narrow rectangular exam room, about twenty-five to thirty-five feet in length. *Id*. at 31, 48. The only door to the room was closed during the interview. *Id*. at 31. She stated that she had worked at PCB for four years, and examined patients frequently in the exam room and was familiar with it. *Id*. at 56, 63. Solomon was initially interviewed by Health and Human Services Special Agent Tameka Williams and DEA Diversion Investigator James Browning. *Id*. at 8-9.[5] During the interview,

---

[5] Solomon claims at times that she was interviewed initially by three people. D.E. 312 at 47. Dalrymple testified that she was interviewed initially by "at least two" people. *Id*. at 8. This

6

Solomon was seated on an exam table to the left side of the room, with Agent Browning across from her with his back against the wall. *Id*. at 31.

Solomon stated that the agents remained about ten to fifteen feet from her during the interview. *Id*. at 49. Agent Williams informed Solomon that she was not under arrest (*Id*. at 64), and the pair interviewed her for about forty-five minutes (*Id*. at 47). She was not physically restrained. *Id*. at 49. Around five minutes before Williams and Browning finished interviewing Solomon, Officer Dalrymple entered the room and asked to speak with her. *Id*. at 30. Dalrymple did not initially advise Solomon of her *Miranda* rights. *Id*. at 26-27. When Dalrymple began to believe that Solomon was lying to him, he advised her of her *Miranda* rights. *Id*. at 27. Dalrymple testified that he read Solomon her *Miranda* rights about five minutes into his conversation with her, and that the total duration of the conversation was fifteen to twenty minutes. *Id*. at 10. After concluding her interview, Solomon exited PCB through the back door. *Id*. at 54.

### b. Applicable Law and Analysis

#### 1. Custody

The Sixth Circuit has held "[i]n a suppression hearing, the burden of proof or persuasion rests with the party seeking to suppress the evidence." *United States v. Lawrence*, Nos. 88-2056, 88-2086, 88-2087, 88-2109, 88-2135, 1989 WL 153161, *5 (6th Cir. Dec. 18, 1989). Thus, "[w]here a party seeks suppression of his statements based upon a failure to receive his *Miranda* warnings, he must demonstrate by a preponderance of the evidence that he was entitled to receive them; *i.e.*, that he was subjected to a 'custodial interrogation.'" *Id*. (citations omitted). At the hearing, defense counsel acknowledged having this initial burden. D.E. 312 at 3-4.

---

inconsistency was never resolved, the third interviewer was never identified, nor is it clear whether the third interviewer may have been Dalrymple himself. Defendant, in her reply brief, argues that Solomon was interviewed by two people. D.E. 268 at 2.

Under the Fifth Amendment to the United States Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court set forth certain procedural safeguards to secure this right. Accordingly, prior to interrogating an individual in custody, law enforcement must warn that individual:

> that [s]he has a right to remain silent, that any statement [s]he does make may be used as evidence against [her], and that [s]he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Absent this warning, any statements "stemming from custodial interrogation of [a] defendant" are not admissible in a subsequent trial. *Id.*

A custodial interrogation occurs when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The parties acknowledge that Dalrymple advised Solomon of her *Miranda* rights at some point during the middle of her interview. D.E. 312 at 26-27, 68-69. Solomon contends that any statements made pre-*Miranda* warnings should be suppressed. D.E. 246-1 at 5-6. Additionally, Solomon contends that Dalrymple inappropriately withheld warnings, questioned her, and then advised her of her *Miranda* rights mid-way through questioning, rendering her post-*Miranda* statements inadmissible pursuant to *Missouri v. Seibert*, 542 U.S. 600, 604 (2004) ("Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent."). D.E. 246-1 at 6-8. Finally, she argues that her statements should be suppressed as coercive and involuntary. *Id*. at 6-8. The issues before the court are whether Defendant was in custody so as to require *Miranda* warnings and whether her statements were voluntary, and if suppression is warranted on either basis, what evidence constitutes fruit of the poisonous tree

8

that must be excluded.

An individual is in custody, for *Miranda* purposes, when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). However, "'a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment.'" *Id.* (quoting *Mathiason*, 429 U.S. at 495) (internal quotation marks omitted). This is because "'any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" *Id.* (internal markings omitted).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). Indeed, "'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). To answer this question, courts look to the totality of the circumstances. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2002). The Sixth Circuit has pointed to several factors to guide a court's analysis of whether an individual is in custody: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *Swanson*, 341 F.3d at 529).

The first and third *Panak* factors, the location of the interview and whether Solomon

9

possessed unrestrained freedom of movement, favor the government.  Although isolated from her fellow employees, Solomon was interviewed at her place of business, in an exam room that she was familiar with, with law enforcement remaining ten to fifteen feet from her throughout the interview.  The door was closed, but unlocked.  Solomon was told that she was not under arrest, and the agents/officers never brandished their firearms or even removed them from their holsters after the initial search.  Though Solomon was not told that she could leave, there is no indication that her freedom to depart was restricted in any way.  These factors weigh in favor of finding that Solomon was not in custody.  *See United States v. Crossley*, 224 F.3d 847, 861-62 (6th Cir. 2000) (holding that defendant was not in custody when she was interviewed in an unused classroom at her place of employment, the agents did not tell her that she could not leave, she was not restrained and was sitting next to the closed, unlocked door, and the agents never brandished a firearm); *United States v. Mahan*, 190 F.3d 416, 420-22 (6th Cir. 1999) (finding that the defendant was not in custody when he was interviewed in a conference room and then an office at his place of employment, he was not threatened with arrest, both interview rooms were unlocked, and the agent did not brandish a firearm or handcuffs); *United States v. Felner*, 2009 WL 1542710 (W.D. Ky. 2009) (finding a defendant not subject to a custodial interrogation during an interview conducted during and in relation to the execution of a search warrant where defendant was interviewed at place of employment during normal business hours).

       The second factor, the length and manner of the questioning, also favors the government.  The uncontradicted testimony establishes that the duration of Solomon's interview with Bowling and Williams was about forty-five minutes, and the duration of her interview with Dalrymple was about fifteen to twenty minutes.  Solomon contends that being questioned "by two government agents in isolation and without *Miranda* warnings weighs in favor of a finding of

10

custody." D.E. 268 at 2.  However, the Sixth Circuit has found interviews lasting up to an hour and a half to be non-custodial.  *See Panak*, 552 F.3d at 467 (finding that an interview of 45 minutes to an hour "compares favorably" to other encounters found to be non-custodial) (citing *Crossley*, 224 F.3d at 861-62 (non-custodial interview of less than one hour); *Mahan*, 190 F.3d at 421-22 (non-custodial interview of 90 minutes)).  Finally, the Court has found that Solomon's testimony that she was told she would wind up in jail with Joel Shumrak and that Agent Bowling raised his voice to her is not credible.  Thus, she was not threatened.  Solomon offers no other authority to suggest that the manner of the questioning supports a custodial interrogation.[6]  She argues that she felt that she could not leave and felt intimidated and scared, but "'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'"  *Stansbury v. California*, 511 U.S. 318, 323 (1994) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).  Thus, her subjective beliefs are irrelevant.

With respect to the fourth factor, Dalrymple stated that he did not remember whether he told Solomon she did not have to answer his questions.  D.E. 312 at 16.  Whether an agent tells an individual that she does not have to answer any questions and can terminate the interview at any time "is a particularly important factor in showing that no custody occurred."  *Panak*, 552 F.3d at 467-68.  Although not a necessary condition, this advice is "frequently sufficient" to find that the interview was conducted in a non-custodial setting.  *Id*. at 467.  Indeed, "[i]n 2004, the Eighth Circuit observed that it was unable to find a single precedent from the Supreme Court or the court of appeals—save for a 1982 Ninth Circuit decision 'decided under an outmoded standard of review'—that 'holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.'"  *Id*. at 468 (quoting *United States v. Czichray*, 378

---

[6]  She testified that certain females with the health department were "rough-talking" and "strict" during her interview (D.E. 312 at 62), but those circumstances are not emphasized as a basis for suppression.  Instead, Solomon's arguments focus on Dalrymple's conduct.

11

F.3d 822, 826 (8th Cir. 2004)). But the opposite is not true—the absence of such a warning does not necessarily mean the interrogation was custodial. Here, no evidence suggests that Solomon was told she did not have to answer. This factor favors Solomon, but does not equate to a custodial interrogation as a stand-alone consideration.

On balance, the totality of the circumstances and the *Panak* factors favor a finding that Solomon was not in custody when interviewed at PCB. Measured by the objective circumstances presented by the evidence, Solomon's freedom of movement was not restrained to the degree associated with formal arrest.

### 2. Coercion

Even if statements are admissible under *Miranda*, they can still be excluded as involuntary. *See United States v. Dickerson*, 530 U.S. 428, 444 (2000) ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry."). An inquiry into the voluntariness of a statement must consider the totality of the circumstances. *See Dickerson*, 530 U.S. at 434.

> Title 18 U.S.C. § 3501(b) instructs:
>
> The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.
>
> The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

18 U.S.C. § 3501(b).  The United States bears the burden of proving the voluntary nature of a confession by a preponderance of the evidence.  *See U.S. v. Johnson*, 351 F.3d 254, 260 (2003) (citation omitted).

A statement is involuntary if it results from interrogation techniques "so offensive to a civilized system of justice that they must be condemned."  *Miller v. Fenton*, 474 U.S. 104, 109 (1985).  Further, "police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  The sole focus is whether the coercion flows from the police, and not "moral and psychological pressures to confess emanating from sources other than official coercion."  *Id*. at 523 citing *Oregon v. Elstad*, 470 U.S. 298, 305 (1985).

The Sixth Circuit has identified "three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement."  *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988).

Solomon argues that "the police activity was objectively coercive because [she] was held in custody and initially interrogated without the benefit of a *Miranda* warning."  D.E. 246-1 at 7.  She further argues that "[s]he was not free to leave and she was subject to the coercive power of the government agents."  *Id*.  She argues that the coercion was sufficient to overbear her will because "[g]overnment agents told her she must cooperate and give a statement or she would be taken to jail."  *Id*.  Finally, she argues that coercion was the crucial motivating factor in her

13

decision to offer a statement "because Solomon spoke with the government agents only to avoid going to jail." *Id*.

As discussed above, the Court finds that Solomon was not in custody. Further, the Court rejects Solomon's testimony that Dalrymple threatened Solomon in any way. Therefore, her argument as to coercion lacks any supporting evidence, the government's evidence supports voluntariness, and suppression is not warranted

### 3.  Suppression under *Missouri v. Seibert*

Finally, Solomon argues that any post-*Miranda* statements would be inadmissible under *Missouri v. Seibert*, 542 U.S. 600, 613-614 (2004) (finding that, in the context of a defendant who hears warnings "only in the aftermath of interrogation and just after making a confession," it is "unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.") Her argument is premised on two conclusions that the Court has rejected—(1) that she was in custody prior to being *Mirandized* and (2) that her statements were coerced. D.E. 246-1 at 7-8. Having rejected those premises, Solomon's argument that the *Miranda* warnings were ineffective due to pre-warning coercive taint fails.

### III.  CONCLUSION

Based upon the foregoing, the undersigned **RECOMMENDS** that Solomon's Motion to Suppress (D.E. 246) be **DENIED.**

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. Pursuant to § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), any party may serve and file written objections to any or all portions for de novo consideration by the District Court. The parties should consult the

aforementioned statute and rule for specific appeal rights and mechanics.  Failure to object in accordance with Rule 59(b) waives a party's right to review.

    This the 27th day of July, 2015.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge