UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Criminal Nos. 13-40-ART-(5),(7),(8) |
| PATRICIA ANN SOLOMON, CARROLL LLOYD ELLIOTT, and LUCILLE M. FRIAL-CARRASCO, | ) ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Two issues linger here. The first concerns forfeiture. Following the Sixth Circuit's recent decision in *United States v. Honeycutt*, 816 F.3d 362, 379–80 (6th Cir. 2016), the Court entered a preliminary judgment of forfeiture holding Lucille Frial-Carrasco, Patricia Ann Solomon, and Carroll Lloyd Elliott jointly and severally liable for the proceeds of their drug conspiracy. They now object. Their arguments find support in the logic and tradition of criminal forfeiture—just not in Sixth Circuit case law. The time may have come to reconsider that law. But this Court must follow the law as it currently exists, and therefore must overrule the defendants' objections.

The second issue concerns sentencing enhancements. The government seeks to enhance Frial-Carrasco's sentence because she allegedly obstructed justice and abused a position of trust. She objects. This time, her objections find support in circuit law. Thus, the objections do not apply.

I.

Frial-Carrasco, Solomon, and Elliott worked at the Pain Center of Broward, located in south Florida—Frial-Carrasco as the medical director, Solomon as a physician's assistant, Elliott as a security guard.  From about June 2008 to May 2014, the Pain Center operated as a "pill mill," dispensing oxycodone prescriptions for no medically necessary reason.  Drug mules visited the Pain Center, got prescriptions, and brought pills back to eastern Kentucky. The conspiracy's ringleader was a man named Joel Shumrak, who owned and ran the Pain Center.  None of these defendants got in on the ground floor:  Solomon and Elliott began work at the Pain Center in November 2010; Frial-Carrasco began in July 2011.  *See* R. 919 at 4; R. 922 at 3; R. 924 at 2.

The government indicted Frial-Carrasco, Solomon, Elliott, and others for participating in the Pain Center conspiracy.  R. 279.  The indictment notified them that the government would be seeking a money judgment—*i.e.*, forfeiture—to the tune of fifteen million dollars, the sum of "which . . . represent[ed] the gross proceeds" of the conspiracy.  *Id.* at 3.  Frial-Carrasco, Solomon, and Elliott went to trial, and the jury convicted them.  *See* R. 762 (Frial-Carrasco); R. 761 (Solomon); R. 760 (Elliott).  That's when the current issues arose.

A.

First, the government asked the Court to enter a judgment of forfeiture against Frial-Carrasco, Solomon, and Elliott.  R. 841.  This time, however, the government sought only seven million dollars.  R. 841-1 at 1.  Seven million is noticeably less than fifteen million. But, the government said, its new estimate was "conservative"—it could have asked for more but, apparently out of leniency, did not.  R. 852 at 3.  What the government neglected to

2

mention was that it had already seized about half of the overall proceeds from their co-defendant, and former boss, Joel Shumrak—eight million, give or take.  *See* R. 919 at 1.

So the government sought to collect the last seven from Frial-Carrasco, Solomon, and Elliott.  The Sixth Circuit recently established that conspirators are jointly and severally liable for their conspiracy's total proceeds.  *See Honeycutt*, 816 F.3d at 379–80.  So the government sought the seven million from these co-defendants jointly and severally, meaning that any one of them could be on the hook for the entire amount.  R. 841-1 at 1.

But when it comes to forfeiture, at least, the government does not get seven million dollars simply by asking.  Rather, the Court "must determine the amount of money that the defendant will be ordered to pay."  Fed. R. Crim. P. 32.2(b)(1)(A).  And if the defendant contests the forfeiture request and asks for a hearing, the Court must hold one.  Fed. R. Crim. P. 32.2(b)(1)(B).  Here, the defendants contested the request and asked for a hearing, so the Court held one.  R. 846; R. 847; R. 919; R. 921.  To establish the conspiracy's overall proceeds, the government called to the stand Agent Richard Dalrymple, who had helped bring the conspiracy down.  Based on his testimony, the Court determined that the Pain Center generated not fifteen, but ten million dollars in illegal proceeds.  R. 919 at 2.

Following the hearing, the Court needed to put out a preliminary judgment of forfeiture.  Fed. R. Crim. P. 32.2(b)(2).  First things first, however, the Court had to calculate what proportion of the overall ten million[1] each defendant owed.  Conspirators are liable only for the foreseeable "scope" of the crime, *i.e.*, the amount of conspiratorial activity they "agree[d]" to help commit.  *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002).

---

[1] Actually, Agent Dalrymple established that the conspiracy made $10,325,000.  To keep the math easier, the Court rounded the total down to the nearest whole million.  Neither party objected at the hearing or since.  *See* R. 919 at 4.

Although the present conspirators maintain their innocence, both sides have conceded that Solomon and Elliott were around for the last eighty percent of the conspiracy, and Frial-Carrasco for fifty percent. To state the obvious, one cannot agree to help do what is already done. And the government has not contended that these three defendants agreed to help launder, stash, or otherwise cover up any money the Pain Center made before they got there. Thus, the Court concluded, Solomon and Elliott could be liable for only eighty percent—and Frial-Carrasco for only fifty percent—of whatever forfeiture amount the government could seek from them.

But how much, exactly, is that? There lies the problem. As the government revealed at the hearing, Shumrak has already paid out some eight million dollars. Though good news for the public, that recovery raises a vexing question for this proceeding: When in the calculation does that eight million apply? The parties have proposed two different methods, which would leave the defendants liable for drastically different amounts.

The government argues that the Court should subtract the Shumrak money directly from the ten-million total, leaving a potential two million for it to recover from these three defendants. The Court would then apply each defendant's foreseeability percentage to *that* amount. Thus, Solomon and Elliott would be liable for eighty percent of the remaining two million (or, $1,600,000), and Frial-Carrasco for fifty percent ($1,000,000). As a shorthand, the Court and parties have called this the pro-rata method; were it to apply this method, the Court would calculate each defendant's individual liability based on whatever proportion of the total proceeds remains unpaid.

The defendants argue, however, that the order of operations should be reversed—the Court should apply the liability percentages *before* subtracting the Shumrak contribution. In

other words, the Court must first calculate the percent of the total that each could owe:  For Solomon and Elliott, eighty percent of ten million (eight million), and for Frial-Carrasco, fifty percent of ten million (five million).  And only then, they say, should the Court subtract Shumrak's eight million.  By their reasoning, this method leaves their forfeiture obligations at zero.  Each of them owes either eight million or less—thus, at least according to them, Shumrak's money covers their shares.  The Court and parties have called this the off-the-top method; were it to apply this method, the Court would calculate each defendant's individual liability based on whatever the total was at the very beginning, or, "off the top."

Because the joint-and-several-liability rule has existed in this circuit for about half a year, neither the Sixth Circuit nor any district court within it has yet faced this problem. Specifically, none has explained how a court should calculate forfeiture liability when (1) it must hold defendants jointly and severally liable for the total proceeds of their conspiracy, (2) but only for the percent of those proceeds that each could reasonably have foreseen, and (3) one co-conspirator has already paid off a large part of the whole.  So, at the hearing, the Court was left to navigate these convergent waters with few channel markers.  Needing to make a decision, the Court adopted the pro-rata method for the purposes of the preliminary judgment.  The Court first subtracted Shumrak's eight million from the overall ten, and then it applied each defendant's liability percentage to the remaining two.  That calculation yielded a judgment of $1,600,000 against both Solomon and Elliot, and a judgment of $1,000,000 against Frial-Carrasco.

But those judgments were only preliminary, and the parties still had a chance to file objections.  *See* Fed. R. Crim. P. 32.2(b)(2)(B).  The Court asked them to clarify, if they

could, this circuit's rules for calculating forfeiture liability under the present circumstances. R. 919 at 4.

B.

Normally, a court must issue preliminary forfeiture orders "sufficiently in advance of sentencing to allow the parties to suggest revisions," because forfeiture judgments usually become final at sentencing. Fed. R. Crim. P. 32.2(b)(2)(B), (b)(4)(A). Here, however, the parties wanted get the sentencing over with. So immediately after the forfeiture hearing, the Court proceeded to sentencing—on the understanding that the forfeiture judgment would not become final until the parties filed written objections and the Court issued a written decision (*i.e.*, this one). *See* R. 919 at 3.

At sentencing, the government tried to impose two enhancements on Frial-Carrasco.[2] *See* R. 909 at 7–10. The first was an enhancement for obstructing justice by lying on the witness stand, pursuant to U.S. Sentencing Guidelines Manual (U.S.S.G.) § 3C1.1 (2015). *See* R. 909 at 9–10. But the government failed to point out any "particular portions" of the record in which Frial-Carrasco had, in fact, perjured herself. *See* R. 919 at 14 (quoting *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir. 2002)). The Court therefore continued the hearing and asked the government to come back with the necessary specifics. *See id.* at 15, 18–19.

The second enhancement was for allegedly abusing a position of trust, pursuant to U.S.S.G. § 3B1.3. *See* R. 909 at 7–9. For the enhancement to apply, the victim of the crime must have put her trust in the defendant, and the defendant must have taken advantage of that

---

[2] Solomon and Elliott's sentencing hearings also involved some disputed enhancements. The Court resolved those disputes at the hearing and need not address them again here. *See* R. 919 at 4–11.

privilege to accomplish the crime. *See United States v. Ragland*, 72 F.3d 500, 502 (6th Cir. 1996). The sentencing guidelines list two kinds of positions of trust that someone can hold and, in turn, abuse: private trust and public trust. *See* U.S.S.G. § 3B1.3.

The government has waived any argument that Frial-Carrasco abused a position of private trust. R. 919 at 17; *see also* R. 926 at 2. According to Frial-Carrasco's presentence report, "no victims can be identified" for her crime. *See* PSR ¶ 36. The government failed to object to that statement, as the rules require a party to do if it thinks it has spotted a problem with the report. Fed. R. Crim. P. 32(f)(1); *see United States v. Ward*, 190 F.3d 483, 492 (6th Cir. 1999) ("[A] failure to object to the presentence report waives any future objections."). Unable now to argue that Frial-Carrasco harmed anyone in particular, the government has no way to prove that she violated anyone's private trust.

But public trust might be different. Doctors, after all, would seem to occupy positions of both private and public trust. In the privacy of the examination room, patients trust their doctors to treat them right. So does the public. Especially given the current drug epidemic, society at large trusts its doctors not to funnel prescription opiates into its communities. Thus, the abuse-of-trust enhancement might still apply to Frial-Carrasco.

But the public-trust enhancement applies only if Sixth Circuit case law confirms this Court's instincts. Namely, the Sixth Circuit must treat public and private trust as separate concepts, so that by waiving its argument as to the first, the government has not also waived its argument as to the second. And the Sixth Circuit must understand doctors as occupying a position of public trust. At the hearing, neither the Court nor the parties knew what the Sixth Circuit has said on the matter. So the Court also asked the parties to brief this issue, too.

C.

Since the hearings, the defendants have filed their objections to the preliminary judgment of forfeiture, arguing that the Court should have applied the off-the-top method and found them all liable for zero dollars. *See* R. 922; R. 924; R. 925. The government has responded, rather briefly, stating, "[i]t is the position of the United States that the Court's pro rata method is proper . . . . These defendants should be liable jointly and severally with Shumrak for the remaining portion of the gross proceeds in the amounts set forth in the preliminary judgment." R. 927 at 1.

As for the enhancements, the government has submitted a list of the many times that, it believes, Frial-Carrasco perjured herself on the stand. *See* R. 926 at 4–10. Frial-Carrasco denies each accusation and objects to the part of the presentence report that chooses to apply the obstruction-of-justice enhancement. *See* R. 928 at 3–18. Both sides have also briefed whether doctors occupy positions of "public trust," as the Sixth Circuit and sentencing guidelines understand the term. *See* R. 926 at 1–4; R. 928 at 2–3. The government objects to the part of the presentence report that chooses not to apply the abuse-of-trust enhancement. *See* R. 926 at 1–4.

II.

The forfeiture questions are easy, on the surface. Question one: Are Frial-Carrasco, Solomon, and Elliott jointly and severally liable for the Pain Center's proceeds? Yes, because the Sixth Circuit has said so. *See Honeycutt*, 816 F.3d at 379–80. Question two: Are they jointly and severally liable for the Pain Center's *entire* proceeds? No, because they joined the conspiracy after it started and never agreed to help it accomplish, or cover up, what it already had accomplished. *See Campbell*, 279 F.3d at 400. And question three:

Does Shumrak's prior forfeiture zero out these defendants' forfeiture liability?  No, because the government still has yet to recover the entire amount (ten million) to which it is entitled; under the theory of joint-and-several liability, then, any of Shumrak's co-conspirators can still be held responsible for the remainder.  *See* Restatement (Third) of Torts: Apportionment of Liability § 25 (2000).  Thus, these conspirators are jointly and severally liable for the as-yet unforfeited proceeds that they agreed to help the conspiracy acquire.

Below the surface, however, things start to look differently.

A.

Question one:  Are Frial-Carrasco, Solomon, and Elliott jointly and severally liable?  Yes, because the Sixth Circuit has said so.  *See Honeycutt*, 816 F.3d at 379–80.  The criminal-forfeiture statute itself, however, does not.  Instead, it dictates, in relevant part, that "[a]ny person convicted of a violation of this subchapter," including drug conspirators, "shall forfeit to the United States . . .  any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as a result of such violation."  21 U.S.C. § 853(a)(1).

Nevertheless, the Sixth Circuit has read the statute to imply joint-and-several liability, largely because the court considered itself bound by an earlier decision, *Corrado*, in which it adopted such liability for forfeiture under RICO.  *See Honeycutt*, 816 F.3d at 380 (discussing *United States v. Corrado*, 227 F.3d 543, 553 (6th Cir. 2000)).  Since the wording of both forfeiture provisions is "virtually identical," the court reasoned, they ought to be interpreted the same way.  *Id.*  This path was the one of least resistance for another reason:  The vast majority of circuits have applied joint-and-several liability to forfeiture under Section 853, RICO, or both.  *See id.* at 379 (collecting cases).

But on the whole, "there has been surprisingly little explanation" for the rule.  *Id.* at 381–82 (Moore, J., concurring in the judgment).  Stitching all the relevant opinions together, what explanation there is seems to rest on three pillars: text, background law, and balance-tipping canons of statutory interpretation.[3]  As for text, the absence of any reference to joint-and-several liability is, apparently, no problem.  The word "indirectly," which Congress also put in the statute, indicates that forfeiture "is not limited to property that the defendant acquired individually but includes all property that [he] derived indirectly from those who acted in concert with him."  *United States v. McHan*, 101 F.3d 1027, 1043 (4th Cir. 1996).  As for the background law, joint-and-several forfeiture liability "resonates with established criminal law principles."  *Id.*  In particular, it is settled that a defendant can be convicted for the foreseeable conduct of his co-conspirators, *see Pinkerton v. United States*, 328 U.S. 640 (1946), and sentenced for that conduct, too, *see* U.S.S.G. § 1B1.3.  It takes no great leap to get from there to making him pay for that conduct, too.  And as for the canons, Congress codified one in the statute:  Courts must construe the statute "liberally" so that it might realize its remedial purpose.  *See* 28 U.S.C. § 853(o); *United States v. Benevento*, 663 F. Supp. 1115, 1118 (S.D.N.Y. 1987) (citing *Russello v. United States*, 464 U.S. 16, 27 (1983)), *aff'd*, 836 F.2d 129 (2d Cir. 1988) (per curiam) (adopting the district court's opinion).

But in the most thorough opinion on the issue to date, the D.C. Circuit broke ranks.  *See United States v. Cano-Flores*, 796 F.3d 83, 91–95 (D.C. Cir. 2015).  Writing on a blank slate, joint-and-several liability is probably not the rule this Court would pick.

---

[3]  Courts have largely applied the same reasoning to Section 853 and to the RICO forfeiture statute, so these cases often discuss both.  For the moment, this Court is only concerned with their reasoning as it applies to Section 853.

1.

What then is the proper scope of a defendant's forfeiture liability under Section 853? Is he jointly and severally liable for the conspiracy's entire proceeds, or is he only liable for some share of them?

Start with the text. *See* Henry J. Friendly, *Benchmarks* 202 (1967) (describing the Justice Frankfurter method of statutory interpretation: "(1) Read the statute; (2) read the statute; (3) read the statute!"). Section 853 requires a defendant to forfeit "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of" his offense. 21 U.S.C. § 853(a)(1). A little convoluted, maybe, but ambiguous, no. The verb "to obtain" means "[t]o bring into one's own possession . . . esp[ecially] through effort." *See* Black's Law Dictionary 1247 (10th ed. 2014); *see also* "obtain, *v.*," Oxford English Dictionary (3d ed. 2004)[4] ("To come into the possession of; to procure; to get; acquire, or secure."). In everyday speech, one might say that "I obtained my undergraduate degree from UK," "The agents obtained the perpetrator's whereabouts from their informant," or "We signed young Jordan up for soccer so he could obtain some athletic skills." In those sentences, the people doing the "obtaining" are putting effort toward bringing something—a degree, some information, a skill—into their possession. By using "obtain" in the statute, then, Congress indicated that conspirators are liable to forfeit whatever property they brought into their own possession by joining the conspiracy—not vicariously liable for whatever proceeds the conspiracy might have churned as a whole.

Fortifying this interpretation further, the statute distinguishes between a defendant's property and the conspiracy's proceeds. Defendants must forfeit "any property constituting,

---

[4] *Available at* www.oed.com.

or derived from, any proceeds." 21 U.S.C. § 853(a)(1). The defendant's forfeitable property might "constitute" the proceeds or merely be "derived" from them—which makes sense. Sometimes, the property and proceeds are the same, as when a small-time duo strikes out in a drug trade and shares all their profits. But other times, the property and proceeds are not the same, as in those more hierarchical arrangements where pushers take a cut based on what they sell, while the overall take gets rendered unto Caesar—or, at least, unto Stringer Bell. *See generally* The Wire (Season Three) (HBO television broadcast Sept. 19–Dec. 19, 2004). For example, just look at the Pain Center—the doctors pushed out drugs and made a salary, but Shumrak reaped the ultimate rewards for running the show. By its wording, Section 853 addresses both types of conspiracies, holding defendants liable for whatever portion of the proceeds they actually shared.

Fortifying this interpretation even further, other provisions of Section 853 focus on the defendant's own possessions, rather than on the possessions of the conspiracy as a whole. Of course, the only provision that really matters is the one requiring defendants to forfeit what they "obtained," because that is all the government seeks from these defendants. But that provision must be read in the context of the statute as a whole. *See Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201–09 (1993); *see also* 1 U.S.C. § 1 (directing readers of the U.S. Code to interpret words in certain ways "unless the context indicates otherwise.").

Here, context confirms what the words themselves make plain. Right after Section 853(a)(1) comes Section 853(a)(2), in which Congress ruled that any person convicted of a conspiracy must forfeit "any of the person's property used, or intended to be used, in" the conspiracy. 21 U.S.C. § 853(a)(2). If a person donated his car to the conspiracy, then he would have to forfeit that car. If he used a gun while participating in the conspiracy, then he

12

would have to forfeit the gun.  But Congress did not write that he must forfeit "any of any other person's property."  Thus, if every other conspirator also used a gun, the defendant would still only have to forfeit his.  He would not have to run around collecting his co-conspirators' guns for the government—which, as a forfeiture system, would make little sense.  *See United States v. Jones*, 502 F.3d 388, 391–92 (6th Cir. 2007) ("A district court must order the forfeiture of a defendant's interest in property when a nexus is drawn between *the defendant's criminal conduct* and the property."(emphasis added)).

Thus, if Section 853(a)(1) leaves any room for doubt, Section 853(a)(2) clears it up. The "property" defendants must forfeit under the statute is not the conspiracy's collective property, but a defendant's own *personal* property.  Depending on the circumstances, that might include "any of the person's property used" during the crime, under Section 853(a)(2), or "any property . . . the person obtained" from the crime, under Section 853(a)(1).  Either way, the statute punishes people for joining conspiracies by taking away the property that they personally gave to or got from the conspiracy—not whatever other property different conspirators might have given or gotten.

Other courts have reasoned that the normal reading of "obtained" does not fit within Section 853(a)(1), where Congress also used the word "indirectly."  "Indirectly," they say, implies that a defendant can be held liable for proceeds that he put no effort into personally possessing.  *E.g.*, *McHan*, 101 F.3d at 1043.  But "indirectly" can peacefully coexist with the normal reading of "obtained."  After all, the word "obtain" itself does not specify whether someone came to possess something "directly" or "indirectly."  If someone wants a nice piece of art for the foyer, she can go out and buy one.  But if she wants to impress visitors with a museum-grade painting, and has neither the means to buy one from the Louvre nor

13

qualms about committing crime, she might contact an art thief.  And although she would not be the one to repel from the ceiling, dodge the laser tripwires, and escape with the piece, she would still "obtain" the piece—albeit indirectly.  Recognizing that such schemes exist, Section 853 is written to capture the unscrupulous art collector and the thief alike.  Or to take a more realistic example, the statute is written to capture someone who indirectly makes dirty money through a company he almost entirely owns.  *See Cano-Flores*, 796 F.3d at 92. (discussing *United States v. Peters*, 732 F.3d 93, 102–04 (2d Cir. 2013)).

The word "obtained" also puts an important limit on liability.  If, while stealing the painting, the thief also nips a priceless statuette, Section 853 would not seem to require that the collector pay for it; she never had that statuette in her possession, and never wanted to. But under joint-and-several liability, the government could seek the statuette from her, too. Some courts, like the Sixth Circuit, attempt to prevent such over-punishment by adding a foreseeability requirement—holding conspirators jointly and severally liable for the proceeds they could have reasonably foreseen that the conspiracy would make.  *See United States v. Logan*, 542 F. App'x 484, 498–99 (6th Cir. 2013).  Given that the thief is the type of person who steals from a museum, however, it might have been foreseeable that he would also take the statuette.  The art collector would probably prefer that a court give the words of the statute their proper meaning, rather than create a problem then apply an imperfect patch.

But by adopting joint-and-several liability, other courts have read this limit—and the word "obtained"—wholly out of the statute.  If a defendant really were jointly-and-severally liable for all the conspiracy's foreseeable proceeds, then Congress had no need to qualify the word "proceeds" in the forfeiture statute with the phrase "any proceeds the person obtained."

14

"These words cannot be meaningless, else they would not have been used." *United States v. Butler*, 297 U.S. 1, 65 (1936).

Giving the words their proper meaning, then, Section 853 does not contemplate joint-and-several liability. *Accord Cano-Flores*, 796 F.3d at 91–95. Rather, the provision appears to require that conspirators forfeit only the property or money they themselves derived from the conspiracy. For a ringleader like Shumrak, that amount might equal the conspiracy's overall proceeds. But for lower-level wage earners like Frial-Carrasco, Solomon, and Elliott, that amount would equal only the checks—plus the value of any benefits or other assets— they received from the Pain Center.

### 2.

Background law confirms that Section 853 is not a joint-and-several-liability statute. To see why, a quick visit back to the founding is in order.

#### a.

Three types of forfeiture existed at English common law. *See Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–83 (1974). The first was called a deodand, from the Latin word for "given to God." *Id.* at 681 & n.16. Anyone who "directly or indirectly caus[ed] the accidental death of a King's subject" would have to surrender to the Crown—next-best option to God Himself—the value of whatever object caused the death. *Id.* at 680–81 (citing Oliver Wendell Holmes, *The Common Law* ch. 1 (1880); 1 William Blackstone, *Commentaries* *300). Second was the forfeiture of estate. *See Austin v. United States*, 509 U.S. 602, 611–12 (1993). Anyone convicted of a felony or of treason also had to surrender his property to the Crown, the theory being that "property was a right derived from society which one lost by violating society's laws." *Id.* at 612 (citing 1 William Blackstone,

15

*Commentaries* *299; 4 *id.* at *382).   The third was statutory forfeiture.   Certain statutes required the forfeiture of objects—like ships—used to violate customs and revenue laws.   *Id.*

Each type of forfeiture "was understood, at least in part, as imposing punishment." *Id.* at 611.   Deodands "properly punished" an object's owner for allowing it to accidentally kill someone.   *Id.* (quoting 1 William Blackstone, *Commentaries* *301).   Forfeiture of estate punished felons and traitors for becoming felons and traitors.   *See The Palmyra*, 25 U.S. (12 Wheat.) 1, 14 (1827).   Statutory forfeitures were likewise "penal" in the sense that they deprived wrongdoers of the property with which they did the wrong.   *Austin*, 509 U.S. at 612 (quoting 3 William Blackstone, *Commentaries* *261).

Ultimately, only the third kind—statutory forfeiture—made its way across the pond. *E.g.*, 21 U.S.C. § 853(a)(2).   Deodands never took hold.   *See Calero-Toledo*, 416 U.S. at 682. And forfeitures of estate were prohibited:   The Constitution forbids using forfeiture of estate to punish treason "except during the Life of the Person attained," U.S. Const. art. III, § 3, cl. 2, and the First Congress forbade using it to punish felons, *see Austin*, 509 U.S. at 613 (citing the Act of Apr. 30, 1790, ch. 9, § 24, 1 Stat. 117).

But statutory forfeitures were already familiar.   The colonies—and later the states— had been enforcing forfeiture statutes "[l]ong before" they adopted the Constitution.   *Calero-Toledo*, 416 U.S. at 683 (modification in original) (quoting *C.J. Hendry Co. v. Moore*, 318 U.S. 133, 139 (1943)).   The First Congress followed along, passing laws that required the forfeiture of ships and cargo involved in customs offenses.   *See Austin*, 509 U.S. at 613 (discussing the Act of July 31, 1789, ch. 5, § 12, 1 Stat. 39).

And as usual, Congress understood those laws as imposing punishment.   Indeed, "'forfeit' is the word Congress used for fine" in these statutes.   *Id.*; *see also id.* at n.7.   And

throughout the centuries, the Supreme Court has understood forfeiture the same way. *See generally J. W. Goldsmith, Jr.-Grant Co. v. United States*, 254 U.S. 505 (1921); *Dobbins's Distillery v. United States*, 96 U.S. 395 (1877); *Harmony v. United States*, 43 U.S. (2 How.) 210 (1844); *The Palmyra*, 25 U.S. (12 Wheat.) 1 (1827); *Peisch v. Ware*, 8 U.S. (4 Cranch) 347 (1808). As the Supreme Court has said more recently, those cases stand on the theory that the owner of a wrongdoing piece of property is "properly punished" for allowing his property to go and get itself involved in a crime. *Austin*, 509 U.S. at 615.

Those early forfeiture statutes were all civil. Congress passed no criminal forfeiture statutes for about the first two hundred years of the nation's history. *See* 3 Charles Alan Wright et al., Fed. Prac. & Proc. Crim. § 571 (4th ed.), Westlaw (database updated Apr. 2016). It got around to doing so in 1970, when it authorized forfeiture for violating RICO and for operating a continuing criminal enterprise. *Id.* n.6 (discussing 18 U.S.C. § 1963 and 21 U.S.C. § 848). Since then, criminal forfeiture provisions have proliferated; forfeiture is now available as a penalty in the "vast majority" of crimes. *Id.* nn.7–12 (surveying statutes). Keeping up with the times, that penalty applies not only to ill-used ships, but also to ill-gotten money. *See* Fed. R. Crim. P. 32.2 (recognizing both kinds of forfeiture).

But "penalty" is, still, the operative word here. Criminal forfeiture provisions, like their aged civil relatives, "are properly considered punishment today," which the Supreme Court has taken pains to explain in the context of other such provisions. *Austin*, 509 U.S. at 619. Legislative history, to the extent that it is relevant, confirms that Congress intended to follow the "historical understanding of forfeiture as punishment" when enacting these provisions. *Id.* at 621. For example, Congress enacted 21 U.S.C. § 881—which, like Section 853, mandates forfeiture to drug offenses—because "the traditional criminal sanctions of fine

and imprisonment are inadequate to deter or punish the enormously profitable trade in dangerous drugs." S. Rep. No. 98–225, at 191 (1983).

Section 853 is no different. Looking at the same words that this Court just analyzed above, *see supra* Part II.A.1, the Supreme Court said that "[t]he text . . . makes clear that Congress conceived of forfeiture as punishment." *Libretti v. United States*, 516 U.S. 29, 39 (1995). As such, forfeiture under Section 853 is part of a criminal sentence. *Id*. It is therefore still no different "from a traditional 'fine.'" *Id*. (quoting *Alexander v. United States*, 509 U.S. 544, 558 (1993)). Section 841 holds defendants substantively liable for joining a conspiracy; Section 853 then punishes them for their particular conduct, just like "any other sentence." *Id*. (quoting 21 U.S.C. § 853(a)). And like the forfeiture provisions before it, Section 853 punishes by taking away the defendant's ill-used or ill-gotten property.

In short, forfeiture is a punishment. It "help[s] to ensure that crime does not pay." *Kaley v. United States*, 134 S. Ct. 1090, 1094 (2014). And Section 853(a)(1) in particular does so pay taking away the money that the defendant's crime paid.

b.

Joint-and-several liability, on the other hand, is based on a theory of restitution. The doctrine is a creature of tort law. *See, e.g.*, Restatement (Third) of Tort: Apportionment of Liability § 10. And its aim is to protect plaintiffs from insolvent defendants. If a defendant turns out to be penniless, joint-and-several liability transfers the cost to his co-defendants— who must pay in his stead—rather than the "innocent victim," who otherwise would not be made whole. *Cano-Flores*, 796 F.3d at 95 (citing Paul Bargren, *Joint and Several Liability: Protection for Plaintiffs*, 1994 Wis. L. Rev. 453, 464). When restitution is the goal—the plaintiff ought to be made whole or, at least, as whole as possible.

18

If restitution were the point of criminal forfeiture, joint-and-several liability would make sense.  Consider splitting a dinner bill among a group of friends.  If the goal is simply to ensure, no matter what, that the restaurant gets paid, then they all owe for the entire bill (however they choose to split it up); in other words, they hold themselves jointly and severally liable for the total.  That way, if one friend happens conveniently to have forgotten his wallet at home, then one or all of the others will pay more to pick up his slack.

But restitution is not the point of criminal forfeiture.  As just discussed, forfeiture is about punishing wrongdoers, not compensating victims.  *See* Black's Law Dictionary 765 (defining "criminal forfeiture" as the "seiz[ure] [of] property as punishment for the person's criminal behavior").  Victims can look elsewhere for that; after all, criminal law has a separate doctrine of restitution.  It is called criminal restitution.  That doctrine has its own set of statutes, like the Mandatory Victims Restitution Act.  *See* 18 U.S.C. § 3663A.  And rather than punishment, its focus is "to make the victim whole."  *See* Federal Criminal Restitution § 13:11 (Catharine M. Goodwin ed.), Westlaw (database updated Aug. 2016).

Imposing joint-and-several liability on Section 853 gets these distinct concepts of punishment and restitution confused.  If the dinner party thought about the bill in the same way that Congress and the courts have traditionally thought about forfeiture, they would not split it up evenly.  They would ask for separate checks.  That way, everyone bears the burden of his own choices; any overeaters are held responsible for ordering too much.

Or consider a 1958 Plymouth.  *See One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700–01 (1965) (discussing the "penalty" of forfeiting the sedan used in a crime). The point of forfeiture is not to provide the government more 1958 Plymouths.  The point is, rather, to punish those who have done wrong and to force those who are considering doing

wrong to think twice. *See Kaley*, 134 S. Ct. at 1094. Thus, if a person buys a Plymouth with drug money, the Plymouth may not be his for long. *See* 21 U.S.C. § 853(a)(1). If another person uses his Plymouth to carry drugs, he too might have to part with the trusted steed. *See id.* § 853(a)(2). In that case, the government would probably seek that Plymouth from its actual owner. *See One 1958 Plymouth Sedan*, 380 U.S. at 700–01. Such is his punishment for donating it to the conspiracy. The government would probably not seek the doors from one conspirator, the tires from another, and the steering wheel from a third.

But under joint-and-several liability, it could. And that, of course, makes little sense. It also requires disregarding Supreme Court precedent, generally a bad idea. The Court has been clear that forfeiture is a "penalty" with "absolutely no correlation to any damages." *United States v. Ward*, 448 U.S. 242, 254 (1980). The government does not quite fit into the shoes of a victim—the everyday drug conspiracy will not cause the government to lose any Plymouths or suffer any other direct harm. Thus, when the government seeks forfeiture, it is not seeking to be made whole. And when the government has argued to the contrary, the Supreme Court has struck that argument down. *See Austin*, 509 U.S. at 620–21. Rather, when the government seeks forfeiture, it seeks to punish. Restitution is simply not forfeiture's job. And so doctrines premised on restitution, like joint-and-several liability, simply have no place under forfeiture provisions like Section 853.

Nevertheless, some courts have reasoned, joint-and-several liability "resonates" with other criminal-law principles—specifically the so-called *Pinkerton* rule that co-conspirators are liable for one another's foreseeable conspiratorial conduct. *McHan*, 101 F.3d at 1043. But that is a principle of substantive liability: It describes the conduct for which a jury may convict conspirators. It does not determine the consequences of actually getting convicted.

Put differently, *Pinkerton* is about the crime, not the punishment.  The forfeiture statute, meanwhile, is about the punishment, not the crime.  Just because one conspirator is liable for another's conduct does not mean he should have to pay for it.  Similarly, a receptionist at the Pain Center might be as guilty as Shumrak for the crimes that occurred while she was there.  But she would not necessarily be sentenced as highly as Shumrak.  The punishment, after all, should fit the crime.  *Accord Cano-Flores*, 796 F.3d at 93.

Under the current joint-and-several-liability regime, however, the punishment could far outstrip the crime.  Bit players could find themselves paying for entire conspiracies.  That is a result that neither the text of the statute nor *Pinkerton* demands.  And it is a result that fairness and background legal principles counsel against.

3.

Text, logic, and background law thus all agree: Section 853 is not a joint-and-several-liability statute.  But if any ambiguity remained, the canons of statutory interpretation would prevent the Court from reading Section 853 the way that other courts have.  Those courts have relied on a "liberal construction" canon to resolve any remaining doubts in favor of joint-and-several liability.  The Supreme Court has ruled that courts should interpret the RICO forfeiture statute "liberally" so as "to effectuate its remedial purposes."  *Russello*, 464 U.S. at 27 (internal quotation mark omitted).  Section 853 contains a provision telling courts to do the same.  *See* 21 U.S.C. § 853(o) ("The provisions of this section shall be liberally construed to effectuate its remedial purposes.").  Given that provision—and the similarities between both forfeiture statutes—courts have construed Section 853 liberally.  And here, construing the statute liberally apparently means adopting joint-and-several liability, which

courts have deemed necessary to effectuate Congress's remedial goal, *i.e.*, to deter criminal conduct.

If a criminal statute is ambiguous, however, another canon comes into play: lenity. Courts must construe criminal laws strictly, so that a citizen will not find himself serving a punishment he never knew existed—or that Congress never created. *See, e.g.*, *United States v. Bass*, 404 U.S. 336, 348 (1971). Here, unless Congress has said otherwise, it would be unfair to make the bit player foot the entire bill. If Section 853 were ambiguous, therefore, lenity would compel the Court to decide against imposing joint-and-several liability.

So would another canon: constitutional avoidance. Under that canon, if a court can reasonably read a law in one of two ways, but the first would raise "serious constitutional problems," the court must choose the second. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Forfeitures violate the Eighth Amendment's Excessive Fines Clause if they are "grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Fining the bit player for the entire conspiracy—as joint-and-several liability allows the government to do— would therefore raise serious constitutional problems. So this canon, too, would instruct the Court not to impose such liability.

Although other courts have made much of the "liberally construed" provision, it is not quite as all-powerful as it seems. *See* 21 U.S.C. § 853(o).[5] The Supreme Court has faced the same phrase in the RICO forfeiture statute, and has made clear that such clauses are not

---

[5] One might wonder why the Court would look to any other canons when the statute itself explains how it should be read. But the "liberally construed" clause is not the Alpha and the Omega of the Court's analysis. Rather, like any other canon, that clause "only serves as an aid for resolving an ambiguity." *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 492 n.10 (1985)). And always, in the background, lurks lenity. *See Russello*, 464 U.S. at 303–04 ("Th[e] rule [of lenity] 'comes into operation at the end of the process of construing what Congress has expressed[.']" (quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961)).

"invitation[s] to apply [a statute] to new purposes that Congress never intended." *Reves*, 507 U.S. at 183.  In other words, such clauses merely serve to clarify—not to outright change— what other nearby provisions mean.

Here, Section 853 never mentions or even hints at joint-and-several liability.  Neither does its legislative history, for that matter.  *See Cano-Flores*, 796 F.3d at 93 (discussing at length S. Rep. No. 98–225, at 192, 195, 210 (Sept. 14, 1983)).  And allowing joint-and-several liability to sneak in through the back door of Section 853(o) would cause another provision—Section 853(a)—to change.  The word "obtained" would thereafter become a useless layabout within the text.  The "liberally construed" provision is not meant to change the face of the text in that way.

Thus, the canons confirm:  Joint-and-several liability and Section 853 are just not meant for each other.

## 4.

But the Sixth Circuit has concluded differently.  Though that conclusion appears ripe for review, this Court must follow the law as the Sixth Circuit has stated it.  And for now, the law is that co-conspirators are jointly and severally liable to forfeit the proceeds of their conspiracy.  *Honeycutt*, 816 F.3d at 379–80.  Thus, Frial-Carrasco, Solomon, and Elliott are jointly and severally liable for the proceeds of the Pain Center conspiracy.

## B.

Question two, however, is:  Are they jointly and severally liable for the Pain Center's *entire* proceeds?  No, because they joined the conspiracy after it started.  Before deciding a defendant's punishment for joining in a conspiracy, the Court must make "*particularized* findings" about "both [1] the scope of the defendant's agreement *and* [2] the foreseeability of

23

his co-conspirators' conduct." *Campbell*, 279 F.3d at 400.  And since *Honeycutt*, the Sixth Circuit has affirmed that this foreseeability limit still applies in criminal forfeiture cases.  *See United States v. Wolford*, 2016 WL 3878213, at *5–7 (6th Cir. July 18, 2016) ("[T]he sentencing court must hold each conspirator jointly and severally liable for these proceeds. With joint and several liability, the amount of proceeds attributable to a defendant is limited to those proceeds reasonably foreseeable to that defendant."  *Id.* at *5 (citations omitted)); *see also Logan*, 542 F. App'x at 498–99 (applying the same rule before *Honeycutt*).

Thus, the Sixth Circuit has tried to mitigate the over-punishment problems of joint-and-several forfeiture liability by building a foreseeability requirement on top.  This hybrid theory has some theoretical bugs of its own.  If co-conspirators truly are jointly and severally liable, then the only question is how much a plaintiff deserves to recover, not how much of the injury a given defendant caused.  In other words, foreseeability simply does not matter—each defendant should be liable for the whole.  Moreover, the hybrid theory is still likely to over-punish.  Compare a hypothetical receptionist and a physician at the Pain Center.  Both were present for eighty percent of the conspiracy.  But the receptionist only took calls; the physician was the one dispensing the drugs.  The physician would appear more culpable. And yet, the government could go after both for the same amount.  It could even go after the receptionist alone, fining her for eighty percent of the overall proceeds while leaving the higher-salaried physician to pay nothing.

Rather than fusing these two theories into one, the Sixth Circuit could consider opting for a more nuanced approach to joint-and-several liability.  Tort theory supplies a number of different liability "tracks," including joint-and-several liability, *see* Restatement (Third) of Torts: Apportionment of Liability §§ A18–19; several liability, *id.* §§ B18–19; joint-and-

24

several liability with reallocation, *id*. §§ C18–21; hybrid liability based on the threshold percentage of comparative responsibility, *id*. §§ D18–19; and hybrid liability based on the type of damages, *id*. §§ E18–19.  One such method could enable a court to attribute forfeiture liability fairly across the members of a conspiracy, from the receptionist to the physician.

But for now, the circuit has solved the problem through foreseeability.  And here, the defendants never agreed to help the Pain Center make or hide the money it had already made before they ever joined the conspiracy.  So the Court cannot make a particularized-enough finding to hold them liable for the conspiracy's entire proceeds.  *Campbell*, 279 F.3d at 400.  Since these defendants did not contribute in each and every dollar the Pain Center earned, they are not responsible for forfeiting each and every dollar on behalf of the conspiracy now.

Thus, even though Frial-Carrasco, Solomon, and Elliott are—technically speaking— jointly and severally liable, they must forfeit only the proceeds that were foreseeable to them.  Since Solomon and Elliott were around for eighty percent of the conspiracy, they are liable to forfeit eighty percent of the conspiracy's proceeds.  And since Frial-Carrasco was around for fifty percent of the conspiracy, she therefore must forfeit only fifty percent of those proceeds. *See, e.g.*, *Wolford*, 2016 WL 3878213, at *6–7.

### C.

Finally, question three:  Does the eight million Shumrak has already forfeited relieve his co-conspirators of their debts?  Under either the "pro rata" or the "off-the-top" calculus, the answer is no.

In a more perfect world, of course, this question would not even arise.  As discussed, Section 853(a)(1)—properly read—requires defendants to forfeit only the property that they personally obtained by joining a conspiracy.  Thus, Section 853(a)(1)—properly applied—

would require the government to prove with particularity the value that a given Pain Center defendant obtained for himself, whether that be his salary, dental benefits, or what have you. In such a world, each defendant's forfeiture liability is clearly delineated from the others', and each must pay his own regardless of what the others do.  But, as discussed, most courts currently do not read this statute this way—leaving this Court to find the next best option.

At the hearing, the Court applied the pro-rata method, first subtracting Shumrak's eight million from the total ten, then applying each defendant's foreseeability percentage to the remaining two.  Under the Sixth Circuit's hybrid theory, that method made some sense. Because the baseline is joint-and-several liability, the Court first had to determine how much "restitution" the government was still owed.  The government has established that number as two million (the total ten minus the Shumrak eight).  Then, to better fit the punishment to the crime, the Court further reduced that amount according to the time that each defendant actually put in at the Pain Center.  For example, Frial-Carrasco was around for fifty percent. Thus, she could only have contributed to—or at least foreseen—fifty percent of the proceeds. And thus, the Court held her liable for fifty percent of what the government could recover: half of two million, or, one million.  For Solomon and Elliott, who were around longer, the math yields a somewhat bigger number ($1.6 million).

All three object, arguing that the Court should have used the "off-the-top" method. On further review, that does seem the better option.  The pro-rata method rests on a flawed assumption: that a conspirator's foreseeable amount of liability is subject to change.  It is not. If a defendant could foresee eighty percent of a ten-million-dollar conspiracy, then he could foresee the conspiracy making eight million dollars.  Obviously, he could also foresee it making seven million, six million, five million, and all the way on down to one dollar.

26

Consequently, he can be liable for anything less than eight million.  And if only two million in conspiracy proceeds remain un-forfeited, he can be held liable for all of them; they are within his penalty range.  Making him pay only eighty percent of that reduced amount, as the pro-rata method dictates, would thus hold him to account for less than what he is actually accountable for.  The pro-rata method skews the penalty.

The off-the-top method largely avoids that problem.  Applying this method, the Court must first calculate a defendant's percentage of foreseeable liability "off the top"—in other words, it must apply the percentage to the whole.  Then, at step two, the court can consider how much other defendants have already paid.  But unlike under the pro-rata method, the Court need not re-calculate the defendant's foreseeable percentage of the new and reduced amount of outstanding proceeds.  After all, just because one defendant has paid the price of his crimes does not mean that his co-defendants actually committed less crime themselves. That was all in the past—the crime stays the same.  So, too, should the penalty.

Granted, the penalty will not stay *exactly* the same.  Co-conspirators are, at present, jointly and severally liable under Section 853.  And joint-and-several liability will create accidental martyrs:  By serving his punishment, one defendant serves—or at least reduces—the punishment of the rest.  This is a funny kind of punishment.  The defendants here could not send an uncle to prison in their stead.  Nor do they get good-time credits for the time that Joel Shumrak serves on his sentence.  But they do get credited for the money he has paid. What if the government had obtained eight million from Elliott before seeking forfeiture from Shumrak?  Then the bodyguard will have paid for most of the conspiracy, leaving its ringleader responsible only for the remainder.  Nor would the outcome look any fairer if

Elliott and Shumrak were both bodyguards.  Elliott would still serve a greater punishment than Shumrak simply because the government sought to punish him first.

These problems would disappear if courts simply stopped thinking about criminal forfeiture in terms of restitution, *i.e.*, joint-and-several-liability.  But for as long as they do, the off-the-top method seems to be the one they should use in times like this.  That method at least has some logic and law to recommend it.  Logically, if Frial-Carrasco could foresee the conspiracy making five million dollars, she could foresee it making two.  Hence, if the government could have forced her to pay five million, it can still force her to pay two.  Foreseeability merely caps the punishment.  Lucky for her that a co-defendant has reduced her share by paying off a chunk of the whole.  But if there is still five million (or less) left, and the government seeks it from Frial-Carrasco, Section 853 would require her to pay it.

Legally speaking, under the Sixth Circuit's current hybrid theory a conspirator must forfeit her foreseeable percentage of the conspiracy's total proceeds.  The off-the-top theory measures exactly that:  It applies the foreseeability percentage to the whole, rather than to whatever amount remains after other defendants chip in.  As such, this method approximates the appropriate punishment for Frial-Carrasco's specific criminal conduct—at least, as nearly as a court can approximate it when starting from the baseline of joint-and-several liability.

Ironically, however, were the Court to apply this method that the defendants espouse, they would end up liable for higher amounts than they already are.  Take Frial-Carrasco as an example again.  She could have foreseen the conspiracy making five million dollars.  Thus, her penalty is five million dollars.  Because she is jointly and severally liable for that penalty, the government could have sought the entire five million from her.  Now, of course, there is

only two million left to seek.  But since Frial-Carrasco is jointly and severally liable for a penalty of up to five million dollars, the government can still seek the leftover two from her.

"Far from it!" the defendants would say.  According to them, the off-the-top method should in fact reduce their forfeiture obligations to zero.  Because the government can only collect five million dollars from Frial-Carrasco, the argument goes, once the government has collected more than that amount from other sources it may never come darkening her door again.  That argument conflates what the government may collect *in total* with what it may collect from anyone *in particular*.  True, the government is entitled only to call in five million from Frial-Carrasco.  But it is still entitled to collect ten million altogether.  And it may collect that money from Frial-Carrasco until either (1) the government hits its limit, or (2) Frial-Carrasco hits hers.  Until either event occurs, Frial-Carrasco is still on the hook.

So, the Sixth Circuit has not yet told courts whether to use an off-the-top or a pro-rata method for calculating forfeiture liability when one defendant has already paid part of the whole.  The off-the-top method, which the defendants claim to support, seems more logical.  That said, the defendants mischaracterize the method.  To them, "off the top" really means "off the bottom"—every single payment raises the floor, cutting into the amount that the government may force any other defendant to pay.  Under that view, if Shumrak had paid one million, then Frial-Carrasco would only be liable for four; if three, then two; and so on.  Because that is not how forfeiture works, the Court cannot adopt their proposed method.

Had the government asked the Court to apply the correct version of off-the-top, the Court might have been obliged to modify its preliminary judgment and hold the defendants each liable for two-million dollars apiece.  But the government has not objected to—and, indeed, supports—the pro-rata method.  *See* R. 927 at 1.  The Court therefore will not award

extra money that the government has not asked for, especially when the defendants have had no notice that they might face stiffer penalties. In short, had the government objected each defendant would have been liable for two-million dollars. The government did not object. As such, the Court will limit the forfeiture to the amount that it previously announced. The Court recognizes that the government argued for this amount at the hearing, but it did not ultimately object to the Court's preliminary judgment of forfeiture. As such, it would be unfair to increase that amount now.

D.

Summarizing the math thus far: The Court has held Frial-Carrasco, Solomon, and Elliott liable for the foreseeable portions of the Pain Center proceeds that remain unpaid. But one more problem remains. During these proceedings, the government has not been exactly consistent in its forfeiture requests. First, it asked for fifteen million. Then it asked for seven million. *Compare* R. 279 at 3, *with* R. 841-1 at 1. The defendants argue that the government is bound by its lowest ask, *i.e.*, seven million, in which case, they argue, Shumrak's eight million would have already satisfied their liability. *See* R. 922 at 5; R. 924 at 2.

That argument takes the government's different requests out of context. In context, they make perfect sense. Initially, in the indictment, the government notified the defendants that it would seek fifteen million dollars from all of them. R. 279 at 3. At some point down the road, the government recovered roughly eight of that fifteen million from Joel Shumrak. *See* R. 295 at 4 (money judgment).[6] Under joint-and-several liability, his co-defendants were then liable for the remaining seven. So that is what the government sought.

---

[6] Although that judgment was technically for only seven million, at the forfeiture hearing the government said that it had collected close to eight from Shumrak—and at any rate has not objected to that characterization since.

As discussed, however, at the hearing the government's evidence established that the Pain Center had grossed only ten million.  After the Shumrak payment, then, two million dollars was all that definitively remained of the Pain Center.  Applying the off-the-top method, Frial-Carrasco, Solomon, and Elliott would all be liable for the entire two million.  Had the government objected to the preliminary judgment, the Court would have applied that method.  But, as discussed, the government did not object, and the Court will not award the government more money than it is now seeking—and more money than the defendants have anticipated forfeiting.

This is all to say that, from the beginning, the defendants have had proper notice of the amount that they are liable to pay.  They have enjoyed better notice, in fact, than the rules of criminal procedure even require.  Under those rules, the government "need not" specify any amount in the indictment.  Fed. R. Crim. P. 32.2(a).  But here, the government did.  And as that number evolved, the government kept the defendants updated.  *See* R. 852 at 2 n.1.  Although the defendants do not agree with the ultimate result, that result could not have come as a surprise.  They were on notice that they might have to pay—indeed, that they might have to pay much more than what the Court ordered.  Thus, notice provides no excuse: The defendants must pay the amounts listed in the preliminary judgment of forfeiture.

E.

The defendants raise two final challenges to the preliminary judgment of forfeiture.  First, Solomon points out that the government chose not to seize some assets from Shumrak that, according to Solomon, would ring up to about $887,000.  R. 924 at 3.  She argues that she "should not bear the cost of the government's forbearance," and thus should receive credit for that unseized amount.  *Id.*

31

But Solomon is not bearing the cost of the government's forbearance—she is bearing the cost of her crime. She is jointly and severally liable for the foreseeable proceeds of the Pain Center, meaning that the government—if it had wanted to—could have collected those proceeds from her alone (up to $8 million, at least). And even if the law did not hold her jointly and severally liable, it would still hold her to her own punishment. The government has the discretion to seek different punishments for different defendants. But Solomon is not entitled to see others punished. Actually, the entitlement works in exactly the opposite way: If a person is convicted of participating in a drug conspiracy, the government is entitled to "any property constituting, or derived from, any proceeds th[at] person" obtained through her participation. 21 U.S.C. § 853(a)(1). Thus, this argument fails.

Second, Frial-Carrasco argues that the Court must reduce her forfeiture amount by "approximately 20%" because the Pain Center was "sometimes open four days a week," yet the government assumed a consistent five-day work week when calculating the conspiracy's gross proceeds. R. 922 at 6. She gets these facts from Agent Dalrymple, who investigated the conspiracy and who testified at the forfeiture hearing. And she accurately recounts one part of his testimony. *See* R. 921 at 6 (testimony of Agent Dalrymple) ("Q: Was there a time period when it was open four days a week? A: Yes, sir. That's correct. Q: Did your calculation take that into account? A: No, sir."). But by focusing on that part, she misses the import of the whole. Though the government did not discount the four-day weeks, it did discount other values. For example, it lowballed the number of clients who visited the clinic each day and did not factor in some of the clinic's other revenue sources. *See id.* at 6–7.

Ultimately, the government must prove the forfeiture amount by a preponderance of the evidence only. *United States v. Evers*, 669 F.3d 645, 660 (6th Cir. 2012). And here, as

32

Agent Dalrymple recounted, the government kept its estimate conservative.  *See* R. 921 at 6–7.  If it erred high on some inputs, it erred low on others.  On top of that, the Court rounded high on Shumrak's forfeiture amount (reducing his co-defendants' liabilities), and low on the conspiracy's overall proceeds (again reducing their liabilities).  *See* R. 919 at 4.  As such, the evidence in the record was sufficient to establish that the Pain Center conspiracy grossed at least ten million dollars.

F.

In sum, the Court must uphold its preliminary judgment of forfeiture.  Frial-Carrasco, Solomon, and Elliott are jointly and severally liable for the Pain Center's proceeds.  At the forfeiture hearing, the government proved that those proceeds were ten million dollars.  A co-defendant, Joel Shumrak, has already forfeited eight million towards that total.  Thus, these three co-conspirators are liable for the remainder, but the court will limit that amount to the preliminary judgment of forfeiture amounts.  For Solomon and Elliott, that comes to $1,600,000, and for Frial-Carrasco, $1,000,000.  They are each liable to forfeit those amounts.

III.

On to the enhancements.  The Court continued Frial-Carrasco's sentencing hearing so that the parties could brief two issues: first, whether Frial-Carrasco deserves a two-level enhancement for obstructing justice by allegedly perjuring herself, and second, whether she deserves a two-level enhancement for abusing a position of trust.  *See* R. 919 at 18–19.

A.

The government seeks an obstruction enhancement because, it says, Frial-Carrasco lied on the witness stand at trial.  The enhancement applies to those who "commit[ed], suborn[ed], or attempt[ed] to suborn perjury."  U.S.S.G. § 3C1.1 cmt. n.4.  Perjury has three elements:  It is "(1) a false statement under oath (2) concerning a material matter (3) with the willful intent to provide false testimony."  *United States v. Watkins*, 691 F.3d 841, 851 (6th Cir. 2012).  To apply the enhancement, the Court must identify "particular portions" of the defendant's testimony in which she commits perjury, and then "either make a specific finding for each element of perjury or . . . make a finding that encompasses all" the elements.  *Lawrence*, 308 F.3d at 632.

At the same time, however, a court must be careful not to "punish a defendant" for exercising her constitutional right to testify in her own defense.  U.S.S.G. § 3C1.1 cmt. n.2.  Not every defendant who takes the stand and later gets convicted has therefore committed perjury.  Her testimony might have been false for any number of reasons, such as "confusion, mistake, or faulty memory."  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  And even if her testimony is truthful, "the jury may nonetheless find the testimony insufficient to excuse criminal liability."  *Id.* at 95.  It is therefore imperative that, before branding any piece of testimony as perjury, the Court find that it exhibits all three perjury elements.

The government initially contended that Frial-Carrasco committed perjury in nine ways, but it has apparently since bumped the number up to ten.  *Compare* R. 909 at 9–10, *with* R. 926 at 5–10.  In support, the government highlights some portions of Frial-Carrasco's testimony in which she describes her work at the Pain Center and her mindset while performing it.  The Court can assume that those statements are material, because they all

34

relate to whether Frial-Carrasco acted (or thought she was acting) within the law when she prescribed oxycodone at the Pain Center. Thus, those statements satisfy the second perjury element, as they "concern[] a material matter." *Watkins*, 691 F.3d at 851. But the government fails to show how they satisfy the other elements: falsity and willfulness. *Id*. Taking each in turn:

*Referrals*. According to the government, Frial-Carrasco's testimony "that she sent patients out for referrals" was "contradicted by the evidence." R. 926 at 5. As an initial matter, testimony does not become false just because other evidence contradicts it. The point of a trial, after all, is to present two contradicting stories and have the jury decide which one it believes. And while on the stand Frial-Carrasco was careful to explain that by "referrals," she meant that she often suggested that patients seek further treatment—not that she actually sent the patients to other doctors, as the government seems to imply. *See* R. 928 at 3–4 (quoting trial testimony). Thus, she did not lie, and certainly not willfully.

*Examinations*. Again, the government says that other evidence "contradicts" Frial-Carrasco's testimony "that she thoroughly examined her patients." R. 926 at 5–6. But if some evidence contradicts her, plenty of other evidence seems to support her, as well. *See* R. 928 at 5–7 (relating testimony from, among others, government witnesses who received physical examinations at the Pain Center). Granted, Frial-Carrasco might have a different idea of "thoroughness" than other doctors. But that does not mean she lied.

*Discharged patients*. Although Frial-Carrasco testified "that many patients were discharged from the clinic due to substance abuse issues," the government says, "nothing could be further from the truth." R. 926 at 6. But the government does not explain what the purported "truth" is. And the government seems to accept that Frial-Carrasco discharged at

35

least ten patients for drug abuse during her time at the Pain Center.  *See id*. at 7.  Ten might

not be "many" in the government's opinion.  But even assuming Frial-Carrasco's opinion has

its faults, expressing a faulty opinion is not the same as willfully lying.

  ***Extent of training***.  The government argues that Frial-Carrasco "vacillat[ed]" about

the amount of pain-management training she had received.  R. 926 at 7.  But "vacillating," by

itself, is not the same as lying.  And the government does not identify any specific statement

that it believes was false.

  ***Knowledge of duties***.  The government argues that Frial-Carrasco must have lied

when she said "that she did not know and/or understand her duties as medical director."

R. 926 at 7.  As the government points out, she was also the medical director of other clinics.

*Id.* at 8.  That is an effective argument—for the jury.  And clearly, the jury bought it.  But

just because the government sold the better story does not mean Frial-Carrasco willfully lied.

Otherwise, what is the ramification for law enforcement—if the opposite is true?  In a case

when a jury acquits, does it mean the law enforcement agents who testified were lying?  Of

course not.  Neither, in this case, was Frial-Carrasco.

  ***Letter of resignation***.  Frial-Carrasco testified that she resigned from the Pain Center

and that she had drafted a letter of resignation on May 15, 2014.  R. 849: Lucille M. Frial-

Carrasco, TR (Day 6) at 321.  But, she also admitted, she never delivered the letter to the

Pain Center, and only sent the letter to the Florida Department of Health after the DEA shut

the Pain Center down in June 2014.  *Id*. at 326–38; R. 869: Lucille M. Frial-Carrasco, TR

(Day 7) at 32–34.  "Nothing could be more deceitful," the government says, than using that

letter to mitigate her involvement with the Pain Center.  R. 926 at 9.  The problem with that

argument, from an obstruction-of-justice standpoint, is that the jury knew of Frial-Carrasco's "deceit" because she testified truthfully about it.

   ***Knowledge that the Pain Center was a pill mill***.  According to the government, Frial-Carrasco "testified that she did not tell [Special Agent] Dalrymple that she believed [the Pain Center] was a pill mill" before she started work there, whereas "Dalrymple testified unequivocally" that she had.  R. 926 at 9.  Actually, she testified to telling Dalrymple that "if [the Pain Center] was [a pill mill], I hoped that it was before my time."  *See* R. 928 at 13 (quoting testimony).  Regardless, this he-said-she-said dispute does not establish that Frial-Carrasco willfully lied about the contents of this conversation.

   ***Knowledge of patients traveling in groups***.  The government says Frial-Carrasco "testified that she did not know patients were traveling together in groups" to the Pain Center.  R. 926 at 9.  But she admitted to knowing exactly that.  *See* R. 849: Lucille M. Frial-Carrasco, TR (Day 6) at 402–04.  She did not perjure herself by admitting the truth.

   ***Accepted range of oxycodone***.  The government points out that Frial-Carrasco told the jury that "180 to 200 pills per month was an acceptable amount" of oxycodone, whereas other doctors testified the safe limit was half that much.  R. 926 at 9–10.  Frial-Carrasco might have been—and was probably—wrong.  Again, however, that does not mean she willfully lied.  And the government provides no evidence showing that she did.

   ***Applicable standard of medical care***.  Finally, Frial-Carrasco testified that she acted within the normal course of medical practice while working at the Pain Center.  R. 849: Lucille M. Frial-Carrasco, TR (Day 6) at 363.  In other words, she claimed innocence.  The government calls this perjury.  If the government is correct, then every defendant who takes

the stand and claims innocence would receive a two-level sentencing enhancement for exercising a constitutional right.  Needless to say, the government is not correct.

Obviously, the government disagrees with how Frial-Carrasco characterized her actions while on the stand.  Ultimately, so did the jury.  But to apply an obstruction-of-justice enhancement on this disagreement alone would punish her simply for asserting a defense, which the guidelines explicitly tell the Court not to do.  *See* U.S.S.G. § 3C1.1 cmt. n.2. Accordingly, the Court will sustain Frial-Carrasco's objection to applying the obstruction-of-justice enhancement.

## B.

The government also seeks an enhancement because, it says, Frial-Carrasco abused a position of trust.  By failing to object to the presentence report, the government has waived its argument that Frial-Carrasco abused a position of *private* trust.  But it might have the better side of the *public*-trust argument, since the general public was also the victim of Frial-Carrasco's crime.  Thus, the abuse-of-trust enhancement might still apply—unless, that is, the Sixth Circuit has read "public trust" and "private trust" to mean functionally the same thing.  In other words, having waived one, can the government assert the other?

The Sixth Circuit has not spoken on this issue—not explicitly, at least.  But it has left behind enough tea leaves for the Court to resolve the current case.  In general, the Sixth Circuit has applied the abuse-of-public-trust enhancement to public officials and employees, *i.e.*, people who work in and for the government.  In *United States v. Brogan*, 238 F.3d 780 (6th Cir. 2001), for example, the court defined "public trust," albeit in a parenthetical aside, as "the necessary faith citizens must have in government for a well[-]functioning republic." *Id.* at 783.  And in *United States v. Gilliam*, 315 F.3d 614 (6th Cir. 2003), the court applied

the public-trust enhancement to a prison guard, even though he worked for a private employer, because he was performing a "traditionally public function." *Id.* at 618. Thus, "public trust" appears to mean the kind of trust that citizens place in their representatives—and their representatives' employees—not to take bribes, embezzle, or otherwise abuse their governmental authority.

By contrast, private trust "is akin to . . . a fiduciary duty." *Brogan*, 238 F.3d at 783 (discussing *Ragland*, 72 F.3d at 503). Such trust "arises when a person or organization intentionally makes himself or itself vulnerable to someone in a particular position," leaving their affairs up "to the other's presumed better judgment." *Id*. Thus, "private trust" refers to the kind of trust that patients place in their doctors not to misuse their information, or that clients place in their lawyers not to take their money and run.

Recently, in an unpublished decision, the Sixth Circuit appeared to hold that a doctor had abused positions of both private and public trust. *See United States v. Fata*, 650 F. App'x 260, 263–64 (6th Cir. 2016). There, however, the doctor had defrauded public health insurance companies. *Id*. So he abused a literal public trust, embezzling money that citizens believed would go to good use. As such, if the court in fact upheld the enhancement because the doctor abused *public* trust, it did so not because doctors inherently hold such a position; rather, it did so because, like the prison guard, he had temporarily entered such a position. That public money came with an implied promise, to the public, that he would not misuse it.

Here, however, neither abuse-of-trust enhancement applies. Granted, the guidelines themselves do not draw a clear line between public and private trust. *See* U.S.S.G. § 3B1.3. But by giving public trust its own distinct definition, the Sixth Circuit has apparently taken the guidelines to mean that the concepts are distinct. It would certainly seem that Frial-

Carrasco violated a position of private trust.  But the government has waived that argument. And of course, the public certainly trusts doctors not to spread drugs through communities. But doctors do not perform the "traditionally public" type of function that the Sixth Circuit has associated with the abuse-of-public-trust enhancement.  *Gilliam*, 315 F.3d at 618.  Nor has the government contended that, like the doctor in *Fata*, Frial-Carrasco defrauded any public health insurers.  Accordingly, the Court will overrule the government's objection to the presentence report.

*     *     *

To conclude, neither Frial-Carrasco, Solomon, nor Elliott has shown why their forfeiture amount is incorrect under the current state of the law.  Although the controlling case law has left some difficult questions unanswered, the Court holds these co-defendants liable for their foreseeable portions of the Pain Center's proceeds.  For Solomon and Elliott, that amount is $1,600,000.  For Frial-Carrasco, it is $1,000,000.

As for the enhancements, the government has not proven that any particular portions of Frial-Carrasco's testimony show the three elements of perjury.  Moreover, the government has waived its abuse-of-private-trust argument, and the abuse-of-public-trust enhancement does not appear to apply to the conduct at issue here.  The Court therefore cannot apply either sentencing enhancement to Frial-Carrasco.

Accordingly, it is **ORDERED** as follows:

(1)     The defendants' objections to the preliminary judgment of forfeiture, R. 922, R. 924, R. 925, are **DENIED**.

(2)     The preliminary judgment of forfeiture, R. 920, is **ADOPTED** as the Court's final judgment.

(3)     Frial-Carrasco's objection to the portion of her presentence report applying the obstruction-of-justice enhancement, R. 904, R. 923, is **SUSTAINED**.

(4)     The government's objection to the portion of Frial-Carrasco's presentence report that does not apply the abuse-of-trust enhancement, R. 909, R. 926, is **OVERRULED**.

This the 31st day of October, 2016.

**Signed By:**

**_Amul R. Thapar_**

**United States District Judge**